OPINION
{¶ 1} On January 15, 2003, a fire occurred at Janet E. Shaver's residence in Bellaire, Ohio. Janet was renting the house from her mother, Betty Shaver. The house was heated by an oil furnace, which was sold and serviced by Sears Roebuck and Co. Appellant, Allstate Insurance Company, had issued a comprehensive renters' policy of insurance to Janet. Allstate paid Janet the benefits of her policy minus her deductible in the amount of $80,397.14.
 {¶ 2} On September 18, 2003, Allstate filed suit against Appellee, Sears, in the Belmont County Court of Common Pleas. Allstate claimed that it was subrogated to Janet's rights, and it sought the return of its payment to Janet. It alleged that Sears breached its duties based in contract and tort to Janet and that Sears negligently caused the damage to Janet's home.
 {¶ 3} On January 12, 2005, Cincinnati Insurance Company also filed suit against Sears seeking subrogation rights based on its payment of property insurance proceeds to Betty Shaver, as owner of the property. Betty had an annual maintenance agreement for the furnace with Sears at the time of the fire.
 {¶ 4} The cases were consolidated, and following discovery, Sears filed its motion for summary judgment. The trial court granted Sears summary judgment as a matter of law. Both Allstate and Cincinnati filed timely notices of appeal. However, Cincinnati has since dropped the pursuit of its appeal. Thus, the instant appeal involves only Allstate and Sears.
 {¶ 5} Although it does not clearly identify it as such, it appears Allstate is asserting one assignment of error on appeal. Allstate argues that the trial court erred *Page 2 
in granting Sears summary judgment since the evidence showed that Sears breached a duty to providing maintenance services in a workmanlike manner and was negligent. For the following reasons, Appellant's argument lacks merit and is overruled.
 {¶ 6} Allstate maintains:
 {¶ 7} "The Trial Court Erred In Granting Summary Judgment In Favor OfDefendant-Appellant As Genuine Issues of Material Fact Exist."
 {¶ 8} Appellate courts review a trial court's decision to grant summary judgment de novo, in the same manner as the trial court.Smiddy v. The Wedding Party, Inc. (1987), 30 Ohio St.3d 35, 36,506 N.E.2d 212. Civ.R. 56(C) provides, in pertinent part,
 {¶ 9} "* * * Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." *Page 3 
 {¶ 10} Once the moving party supports its motion with the necessary evidence, the nonmoving party, "may not rest upon mere allegations or denials of the party's pleadings, but the [nonmoving] party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); Wing v. Anchor Media, Ltd. of Texas (1991), 59 Ohio St.3d 108,111, 570 N.E.2d 1095.
 {¶ 11} Appellant raised claims against Sears based on the contract between Sears and Betty Shaver. It also alleged negligence on the part of Sears. The trial court concluded that Allstate was unable to raise a contract claim against Sears since its insured was Janet, and not Betty. The trial court found that Allstate could not file suit based on the contract since Janet was not an intended beneficiary. (Feb. 16, 2006, Judgment Entry.)
 {¶ 12} "No one can maintain a suit for breach of contract unless that person is an original party to the contract or derives rights from an original party." (Citation omitted.) Elite Designer Homes, Inc., v.Landmark Partners, 9th Dist. No. 22975, 2006-Ohio-4079, at ¶ 68. InHill v. Sonitrol of Southwestern Ohio, Inc. (1988), 36 Ohio St.3d 36,40, 521 N.E.2d 780, the Ohio Supreme Court held that although the performance of a contract may benefit a third person, unless the third person is an intended beneficiary, no duty to him or her is created.Hill adopted Section 302 of the Restatement of the Law 2d, Contracts (1981) 439-440, which provides,
 {¶ 13} "`(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to *Page 4 
performance in the beneficiary is appropriate to effectuate the intention of the parties and either
 {¶ 14} "`(a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
 {¶ 15} "`(b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.'"
 {¶ 16} Janet was not a party to the Sears service agreement; however, this does not automatically preclude claims based on the agreement between Sears and Betty Shaver. The record discloses that Janet's mother paid for this annual service agreement with the intent to benefit her daughter, who was occupying the house. Janet testified that her mother paid for the annual maintenance agreement even though Janet, and not Betty, was living in the house. (Janet Shaver Depo., pp. 23, 26.)
 {¶ 17} Further, Sears acted upon its duties to service the Shaver furnace and to perform the annual maintenance at Janet's requests. There is no evidence to the contrary. Thus, the unrefuted evidence reflects that Betty and Sears treated Janet as an intended beneficiary. Accordingly, Janet would have had the right to pursue a claim founded in contract and Allstate's rights derived from Janet's.
 {¶ 18} Notwithstanding the two identified causes of action, both of Allstate's claims focus on Sear's alleged negligent instructions to Janet. The crux of both is that Sears' service representatives negligently instructed Janet to consecutively *Page 5 
press the furnace reset button, which resulted in the fire. Thus, we will address both arguments together in reviewing this matter.
 {¶ 19} In order to establish a cause of action in negligence, a plaintiff must show the existence of a duty, breach of that duty, and damages that were proximately caused by the breach. Texler v. D.O.Summers Cleaners Shirt Laundry Co. (1998), 81 Ohio St.3d 677, 680,693 N.E.2d 271.
 {¶ 20} At issue in this appeal is Sears' duty to Janet regarding the maintenance and repair of the forced air fuel oil furnace. Allstate claims that Sears breached its duty to Janet when it advised her to manually and repeatedly hit the reset button on the furnace. Allstate claims this instruction resulted in the fire. However, as the following analysis reveals, Appellant has failed to meet its threshold burden to establish that Sears breached any duty. It also failed to establish that some action or failure to act on the part of Sears caused the fire.
 {¶ 21} It is undisputed that Sears owed Janet a duty to perform maintenance and repair services in a reasonably prudent manner. It is also undisputed that someone at Sears advised Janet that is was appropriate for her to manually push the reset button on the furnace once, in the event that it was not operating.
 {¶ 22} Allstate filed deposition testimony of two expert witnesses: Russell Bennett, a fire investigator; and Carl Kieffer, an engineer. Bennett testified during his deposition that the fire that destroyed the Shaver home began in the basement in the area of the furnace. However, Bennett could not identify any act or failure on the part of Sears that resulted in the fire. (Bennett Depo., pp. 162-163.) *Page 6 
 {¶ 23} Kieffer identified several possible causes of the fire in his discovery deposition. Kieffer indicated that there may have been a leak at one of the furnace's flared fittings. However, this testimony was mere speculation. Kieffer also took issue with Sears' service instruction to Janet to repeatedly push the reset button on the furnace. Kieffer testified that pressing the reset button multiple times could alone be the cause of this fire. However, Kieffer did not know whether this had, in fact, occurred and he could not state that this was the cause with any probability. (Kieffer Depo., pp. 69, 72, 82 86, 96-100.)
 {¶ 24} Contrary to Kieffer's testimony, there is nothing in the record indicating that Janet pressed the reset button more than once on the day of the fire. Her deposition testimony reveals that she had lived in her mother's house in Bellaire, Ohio, since 1997. Betty paid an annual fee for the maintenance agreement with Sears covering the furnace. The agreement included an annual furnace cleaning and maintenance check. (Janet Shaver Depo., pp. 15, 23, 26.)
 {¶ 25} Janet stated that the furnace quit working about five to six times per winter. She explained that a Sears' maintenance representative told her that if the furnace went out and Sears was unable to come to her home, she was to take the panel off of the furnace and push the reset button once. She was not told to push the reset button more than once at any given time. Instead, if she pushed the button and the furnace did not kick on, then she was to call Sears. (Janet Shaver Depo., pp. 27-29.) On those occasions when she did call Sears, Janet estimated that in all of the time she lived in the house, Sears told her on approximately six occasions to press *Page 7 
the reset button a second time. Her phone instructions were always to press it once, call Sears and then go back down to the basement and press it a second, later time. Sears never told her to press it a third time. (Janet Shaver Depo., pp. 29-30, 32-33, 51.)
 {¶ 26} Janet was asked at deposition,
 {¶ 27} "Q. Were you told that by pressing it [reset button] once, that it would reset the furnace?
 {¶ 28} "A. Should.
 {¶ 29} "Q. Did anybody ever instruct you that if it didn't start the first time, that you were to do it a second time?
 {¶ 30} "A. No. To call Sears.
 {¶ 31} "Q. So they said if it didn't start when you pushed it once, that you were to call Sears?
 {¶ 32} "A. Yes.
 {¶ 33} "Q. Did you follow that instruction?
 {¶ 34} "A. Yes, I did." (Janet Shaver Depo., p. 29.)
 {¶ 35} Janet also stated that the furnace always smelled of oil; sometimes when she pressed the reset button, the oil smell was more prevalent. She also stated that one Sears technician told her that Sears should have installed a new furnace since she had so many problems. She claimed that all the service representatives asked Sears to give her a new furnace. (Janet Shaver Depo., pp. 30-31, 46, 47.) *Page 8 
 {¶ 36} Janet said she had to press the furnace reset button about four to five times during 2002. Sears' last maintenance check of the furnace was December 3, 2002. (Janet Shaver Depo., pp. 53, 55-56.)
 {¶ 37} The fire occurred on January 15, 2003. The week or two before the fire, Janet recalls pressing the reset button about four separate times. She said she called Sears during the first week of January, but she cannot recall if a Sears' technician actually came to her home. (Janet Shaver Depo., pp. 58-59, 65.)
 {¶ 38} On the night before the fire, the heat went out at about eleven p.m. It came back on after she pressed the reset button once. The next morning, Janet woke up at about six and the house was cold. She hit the reset button once and the furnace came back on. She took her granddaughter to school at 7:30 a.m. The furnace was on and the house was warming up when they left. She returned home about an hour later and the house was cold again. She pressed the reset button one time, and the furnace came on. She did not call Sears that day. She again left home at about 8:50 a.m. to go shopping. She did not return until approximately 3:00 p.m., to find the house had burned down. (Janet Shaver Depo., pp. 59, 68, 69-71, 73.)
 {¶ 39} She opined that Sears was to blame for the fire because they should have installed a new furnace. However, Janet denied that she pressed the reset button more than once at a time on the day of the fire. While she hit the button more than once that day, it was approximately an hour later and after the furnace had once come back on. (Janet Shaver Depo., pp. 77, 81, 87.) *Page 9 
 {¶ 40} Sears stressed in its motion for summary judgment that Kieffer's theory of negligence was based on an incorrect assumption, since Janet did not repeatedly press the reset button on the day of the fire. One of Kieffer's possible theories of causation was based on the repeated consecutive pressing of the furnace's reset button.
 {¶ 41} Sears also cited to the report of the Assistant Ohio State Fire Marshal, Harry Barber, in support of its motion for summary judgment. Barber examined the Shaver home on the day of the fire while the fire was still smoldering. The fire was discovered late in the burn since it was located on a secluded lot. Upon Barber's arrival, he was advised that the furnace had not been operating properly. Barber specifically noted the following in his report section titled "ORIGIN and CAUSE."
 {¶ 42} "I surveyed the fire area and was unable to determine a specific area of involvement. There was some wind during the fire and according to the fire chief, this caused the fire to burn very quickly. * * *
 {¶ 43} "I examined the electrical system. The electricity is supplied from the power company via a 3 wire system. In this particular case the conductors are uninsulated. At the bottom of the hill there is a transformer. Usually a modern triplex wire is taken form the transformer and laid to the top of the service entrance. In this case three bare conductors spaced about 12 inches apart from top to bottom are connected to the utility poles by insulators and are laid from the transformer to the service entrance. I determined that the top conductor was utilized as the neutral conductor and the others as 120 volt supply lines. I observed several black marks on *Page 10 
the conductors that I recognized as arc marks. I went to the service entrance pole and gently pushed on the pole. At that time the top conductor came in contact with the center conductor and arcing occurred. In this type of setup, all of the appliances in operation at the time of contact on the bottom conductor would receive 240 volts as the neutral became energized by the other 120 volt line. There would also have to be some resistance in the ground circuit to allow for current to flow to the neutral. This resistance is likely because it appears that the ground is currently being supplied by the support cable. Although it cannot be determined that the furnace motor was on the bottom line, this situation may have caused problems with the furnace as previously noted. Not only to the furnace but everything else in the home that was energized at the time of the arcing. I believe that this is a very plausible possibility for the cause of the fire in light of the lack of evidence to suggest another." (Ohio State Fire Marshall, Incident Report.)
 {¶ 44} In another section of his report entitled "NARATIVE," [sic] Barber noted the following: "Made contact with Mrs. Shaver. Obtained information on electrical components in home that were intermittent. Light bulb on porch caught fire. VCR went bad and she stated that she has had many problems with her furnace." (Ohio State Fire Marshall, Incident Report.)
 {¶ 45} Although Barber could not identify with certainty the cause of this fire, he indicated that it may have been caused by the electrical system. His theory of the fire's origin would also explain the recurring problems with the furnace and Janet's other electrical devices. *Page 11 
 {¶ 46} The affidavit of Sears' Manager of Technicians, Scott Santo, confirmed that the Shaver furnace was serviced by technicians from his office. Santo attached the service records for the furnace dated May 20, 2000, through December 3, 2002, indicating that there were no service call records after December 3, 2002, up to and including the date of the fire, January 15, 2003.
 {¶ 47} In opposition, Allstate argued that its expert witnesses established that Sears' technician's negligent instructions to Janet resulted in the fire that destroyed her home. Even taking as true the deposition testimony of the two experts on behalf of Appellant, as we must do in a summary judgment matter, Appellant is clearly mistaken in this assertion. Neither of its expert witnesses testified to this effect. Bennett did not offer any opinion as to the cause of the fire, only that it likely started in the basement. Kieffer, on the other hand, identified several possible causes, but no one probable cause. There is no testimony that provides that Sears acted contrary to the standard of care in advising Janet to press the reset button or that it otherwise breached a duty to Janet.
 {¶ 48} Kieffer was contacted in this case by Scott Bennett. Bennett told Kieffer that he believed the fire began in the furnace and inquired as to whether it could have been caused by one repeatedly hitting the reset button to keep the furnace running. Kieffer researched whether it was a good idea to repeatedly hit the reset button on this type of furnace on the internet. He concluded that it was not. (Kieffer Depo., pp. 18-19, 25-26.) *Page 12 
 {¶ 49} Bennett advised Kieffer that the occupant of the house had been repeatedly and consecutively pressing the reset button. Kieffer never interviewed Janet. It was Kieffer's understanding that the Sears' maintenance technician instructed Janet to repeatedly push the button. Although he indicated that the timing was relevant, Kieffer stated he had no idea when a Sears' technician last visited the Shaver home prior to the fire. (Kieffer Depo., pp. 28-30, 31-32.)
 {¶ 50} After examining the furnace, Kieffer concluded that it did not look like there was an electrical problem. (Kieffer Depo., p. 35.) There is nothing in the record to indicate whether Kieffer examined the exterior electrical transformer and conductors as Barber did.
 {¶ 51} In his report, Kieffer made the following statements in the section entitled "discussion":
 {¶ 52} "One of the issues discovered by OCA Fire Investigator Scott Bennett during the investigation of this fire was the fact that a service mechanic reportedly instructed the insured to press the burner reset button several times if the burner did not light. * * *
 {¶ 53} "Resetting the burner control more than once would probably create a situation where there was an excessive amount of fuel oil in the combustion chamber. When the furnace called for heat and the burner ignited, this extremely rich fuel mixture in the chamber, the resulting flame could have `backfired' or `rolled-out' of the combustion chamber into the furnace compartment around the burner. This in turn would have ignited any oil lying in the compartment. Based on the severity of *Page 13 
the damage in the burner compartment, a fuel source such as fuel oil appears to be a strong possibility since the only other flammables in this area were probably wire insulation and some plastic components." (Kieffer Depo., Exh. A.)
 {¶ 54} Thereafter, Kieffer made the following conclusions:
 {¶ 55} "1. There may have been a leak in the burner fuel oil line connection of this furnace, which caused fuel oil to accumulate in the burner compartment.
 {¶ 56} "2. It is probable that a malfunction in the combustion chamber of this furnace ignited flammables [sic] materials in the burner compartment, including fuel oil, which in turn caused this house fire." (Kieffer Depo., Exh. A.)
 {¶ 57} In response to questions regarding paragraph two of the "conclusions" section of his report, Kieffer testified that there was a "strong possibility" that repeatedly hitting the reset button led to excess fuel oil in the compartment. Importantly, here, he could not state with probability that this was the cause of the fire. (Kieffer Depo., pp. 80-81.) Further, this conclusion was based on the premise that Janet repeatedly and consecutively pressed the reset button as allegedly instructed by Sears.
 {¶ 58} Kieffer did conclude (again, based on this apparently false premise) that there was a probability that there was excess fuel in the combustion chamber as a result of the customer re-hitting the reset button. However, any remaining fuel from the re-hitting of the reset button would have been consumed in the next ignition or cycle of the furnace. (Kieffer Depo., pp. 98-99.)
 {¶ 59} Kieffer was asked under objection: *Page 14 
 {¶ 60} "Q. Are you testifying that the Sears technician was somehow negligent, and that the technician's negligence caused the fire?"
 {¶ 61} "* * *
 {¶ 62} "A. I question — I question why he told the insured to keep hitting the reset. I feel as though there was a problem with this burner that he couldn't fix, and that he should have brought in more expertise or advised the insured, you need to change this [furnace] out[.]" (Kieffer Depo., pp. 69-70.)
 {¶ 63} After taking the furnace apart, Kieffer recognized that the connection where the burner met the combustion chamber appeared to be missing sealant. He stated that it was possible that the lack of sealant or, "caulking on the bottom made it possible for heat and possibly flame to come out, out of the compartment [combustion chamber]." (Kieffer Depo., pp. 55-56.) Yet Kieffer did not locate the manufacturer's specifications to determine if this connection called for sealant. He also could not state with reasonable mechanical engineering certainty that there was a leak. It was not even probable; only possible. (Kieffer Depo., pp. 56, 72.) Hence, a reading of all of Kieffer's deposition testimony reveals that there were several possible, not probable, ways the furnace could have started a fire in his opinion. Of course, his opinion as to one possible cause was based on a hypothetical situation where the homeowner repeatedly pressed the reset button. However, Appellant's own unrebutted testimony in the form of Janet's deposition shows that this was an incorrect assumption. *Page 15 
 {¶ 64} Kieffer based his incorrect hypothetical on information given him by Bennett. However, when she reviewed Bennett's report, Janet testified that his statement was inaccurate. She never told Bennett Sears instructed her to press the red reset button three or four times until the furnace started. (Janet Shaver Depo., p. 32.) She responded, "[t]here was [sic] times I did push it three times. Years ago though." (Janet Shaver Depo., p. 33.)
 {¶ 65} In addition, while Bennett opined the fire began in the area of the furnace, he could not identify the cause of the fire. (Bennett Depo., pp. 122, 163.) He stated that the fire was not caused by the electric meter and wiring because there was no evidence to this effect. However, he admitted that he was unable to examine the electrical wiring to the furnace. (Bennett Depo., pp. 58-59, 62.) Bennett was asked:
 {¶ 66} "Q. Do you have any expert opinion as to what the cause of the fire was?"
 {¶ 67} "A. I have an opinion where this fire started, and I think that would be it.
 {¶ 68} "Q. You have no opinion as to what caused this fire, do you?
 {¶ 69} "A. No." (Bennett Depo., p. 163.)
 {¶ 70} Sears also retained an expert, Peter E Susey, a certified fire and explosion investigator. He reviewed the Ohio State Fire Marshall Report, the deposition and report of Carl Kiefer, the deposition and report of Russell Bennett, and the deposition of Janet Shaver, as well as several other sources. Based on his experience and his analysis of the evidence, Susey concluded, "it is my opinion in *Page 16 
terms of reasonable engineering probability that there is no physical evidence that the furnace malfunctioned or back-flowed combustion products into the dwelling. It is further my opinion that the physical evidence indicates that the furnace was not the cause of the fire." (Susey Affidavit, ¶ 7.)
 {¶ 71} "Normally, the issue of proximate cause involves questions of fact and cannot be resolved by means of summary judgment. * * * However, if the facts are undisputed, the issue becomes a question of law which can be determined on summary judgment. * * * If the plaintiff's quantity or quality of evidence on the issue of proximate cause requires mere speculation and conjecture to determine the cause of the event at issue, then the defendant is entitled to summary judgment as a matter of law." (Citations omitted.) Welch v. Bloom, 6th Dist. No. L-04-1003,2004-Ohio-3168, at ¶ 11.
 {¶ 72} Turning to the evidence submitted, an expert testifying on the issue of causation must testify in terms of probability. Stinson v.England (1994), 69 Ohio St.3d 451, 455, 633 N.E.2d 532, paragraph one of the syllabus; Lorensen v. Greunke (Sept. 22, 2000), 6th Dist. No. OT-00-011, 1. An event is probable if, "there is a greater than fifty percent likelihood that it produced the occurrence at issue."Stinson, 69 Ohio St.3d at 455, 633 N.E.2d 532. An expert witness' knowledge cannot be based on subjective belief or unsupported speculation. State v. Hurst (Mar. 7, 2000), 10th Dist. No. 98AP-1549, 9. Thus, an expert is precluded from giving causation testimony that amounts to conjecture or speculation. Stinson, supra, at 457,633 N.E.2d 532. *Page 17 
 {¶ 73} Again, neither Kieffer nor Bennett was able to state that Sears' instructions to Janet or anything else that Sears did or did not do probably resulted in the fire. In addition, there was no evidence that Sears actually told Janet to re-hit the reset button multiple times in a row. In fact, Janet's own evidence established just the opposite.
 {¶ 74} Viewing the evidence in a light most favorable to Appellant, there are no genuine issues of material fact in this case which remain for trial. Allstate failed to present any evidence establishing that Sears breached a duty relative to its maintenance and/or repair of the Shaver furnace. More importantly, Allstate has also failed to establish that some act or failure on the part of Sears caused the fire that destroyed the Shaver residence. Mere speculation or possibility is not enough to defeat a summary judgment motion. Stinson at 457,633 N.E.2d 532. Appellant had an opportunity to submit additional evidence to support its allegations in order to defeat Sears' motion for summary judgment, but it did not do so.
 {¶ 75} The mere fact that a fire occurred in the area of the furnace is not sufficient to establish negligence. Possibility and speculation is not evidence. There must be actual evidence showing that some negligent act or omission caused the fire. J.C. Penny Co., Inc. v.Robison (1934), 128 Ohio St. 626, 193 N.E. 401, paragraph four of the syllabus.
 {¶ 76} Accordingly, the trial court's decision to grant summary judgment to Appellee is correct because Appellant failed to offer any evidence tending to establish with reasonable probability that Sears caused this fire. See Stamper v. *Page 18 Middletown Hospital Assoc. (1989), 65 Ohio App.3d 65, 67-68,582 N.E.2d 1040 (holding that in a slip and fall plaintiffs inability to establish cause of fall precludes recovery). The fact that Appellant's experts believed, based on pure speculation, that the fire started in the area of the furnace coupled with the fact that Janet was having recurring problems with the furnace was not enough to send these claims to the jury.
 {¶ 77} Based on the above, we overrule Appellant's sole assignment of error on appeal and affirm the decision to grant summary judgment to Appellee.
 Donofrio, J., DeGenaro, P.J., concurs. *Page 1