[Cite as *Heiert v. Crossroads Community Church, Inc.*, 2021-Ohio-1649.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| JOHN HEIERT, | : | APPEAL NO. C-200244 |
| | | TRIAL NO. A-1901458 |
| and | : | |
| DANA HEIERT, | : | *O P I N I O N.* |
| Plaintiffs-Appellants, | : | |
| and | : | |
| OHIO BUREAU OF WORKERS' COMPENSATION, | : | |
| Intervenor-Plaintiff-Appellant, | : | |
| vs. | : | |
| CROSSROADS COMMUNITY CHURCH, INC., | : | |
| CROSSROADS WESTSIDE, | : | |
| THE CINCINNATI AIR CONDITIONING COMPANY, | : | |
| and | : | |
| RICHARD GOODSON, | : | |
| Defendants-Appellees. | : | |

| | | |
|---|---|---|
| ROBERT COAKLEY, | : | APPEAL NO. C-200391 |
| | | TRIAL NO. A-1901475 |
| Plaintiff-Appellant, | : | |
| and | : | *O P I N I O N.* |
| OHIO BUREAU OF WORKERS' COMPENSATION, | : | |
| Intervenor-Plaintiff-Appellant, | : | |
| vs. | : | |

CROSSROADS COMMUNITY     :
CHURCH, INC.,

CROSSROADS WESTSIDE,     :

THE CINCINNATI AIR     :
CONDITIONING COMPANY,

  and     :

RICHARD GOODSON,     :

    Defendants-Appellees.     :


Civil Appeals From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are:  Affirmed

Date of Judgment Entry on Appeal:  May 12, 2021


*Law Offices of Blake R. Maislin, LLC,* and *Randy A. Byrd*, for Plaintiffs-Appellants John Heiert, Dana Heiert, and Robert Coakley,

*The Sammarco Law Firm, LLC*, and *Alissa Sammarco*, for Plaintiff-Appellant Robert Coakley,

*David A. Yost*, Ohio Attorney General, *Sonnet and Goldblatt, Ltd.*, Office of Appointed Special Counsel for the Ohio Attorney General, *Greg A. Goldblatt* and *Andrew D. Sonnek*, for Intervenor-Plaintiff-Appellant Ohio Bureau of Workers' Compensation,

*McCaslin, Imbus, and McCaslin*, and *William M. Cussen*, for Defendants-Appellees Crossroads Community Church, Inc., Crossroads Westside, and Richard Goodson,

*Barron, Peck, Bennie, & Schlemmer Co., LPA*, and *Arthur H. Schlemmer*, for Defendants-Appellees Crossroads Community Church, Inc., and Crossroads Westside,

*Matthew R. Skinner*, for Defendant-Appellee The Cincinnati Air Conditioning Company.

**ZAYAS, Presiding Judge.**

{¶1}  Raising two assignments of error, plaintiffs-appellants John Heiert, Dana Heiert, and Robert Coakley bring these consolidated appeals to challenge the trial court's grant of summary judgment in both cases in favor of defendants-appellees Crossroads Community Church, Inc., ("Crossroads") Crossroads Westside, The Cincinnati Air Conditioning Company ("Cincinnati Air"), and Richard Goodson. For the following reasons, we overrule both assignments of error and affirm the judgments of the trial court.

## Factual and Procedural Background

{¶2}  Plaintiffs-appellants filed respective complaints against defendants-appellees, alleging claims for negligence and a declaratory judgment.[1]  The claims arise from a boiler explosion that occurred at the Crossroads Westside campus on January 6, 2016.  The explosion occurred while two employees of Blau Mechanical ("Blau"), plaintiffs-appellants John Heiert and Robert Coakley, were working on one of two boilers located at the Crossroads Westside facility.  The undisputed cause of the explosion was a jumper wire installed on the boiler's oil/gas toggle switch.  What remains to be known, and what is essential to this case, is who installed the jumper wire that caused the explosion.

{¶3}  In both cases, Crossroads, Crossroads Westside, and Goodson, collectively, and Cincinnati Air, separately, filed motions for summary judgments.

---

[1] Both complaints also listed Stephen Buehrer, in his official capacity as Administrator of the Ohio Bureau of Workers' Compensation, as a defendant.  However, the Ohio Bureau of Workers' Compensation ("OBWC") filed a motion in each case to be realigned as a named party plaintiff. The trial court granted both motions, allowing OBWC to intervene as a named party plaintiff in both cases, and OBWC filed a complaint against defendants-appellees in each case.  Both complaints also list "John Does I though X" as defendants.  However, there is no indication in the record that any additional party was ever identified in either case, nor any indication that any John Doe defendant was served.  The Heiert complaint also alleged a claim for loss of consortium.

3

Essentially, the motions argued that plaintiffs-appellants failed to present evidence that any defendant installed the jumper wire. In response, plaintiffs-appellants filed a memorandum in opposition to the summary-judgment motions, arguing that (1) when the jumper wire was installed and who installed the jumper wire were issues of material fact to be decided at trial, and (2) the doctrine of res ipsa loquitor should be applied. Ultimately, the trial court granted summary judgment, finding no evidence to show that any defendant installed the jumper wire or acted negligently, and no evidence to show that the explosion and resulting injuries were the result of any action by the defendants. Additionally, the trial court found the doctrine of res ipsa loquitor to be inapplicable.

{¶4} The evidence in the record included (1) depositions of Richard Goodson, Mike Cordeiro, John Heiert, Brad Davis, Mark Sokalski, and Richard Kovarsky, (2) two affidavits of Richard Kovarsky, and (3) an affidavit of Mike Cordeiro.[2]

*Depositional Testimony of Richard Goodson*

{¶5} Crossroads Westside was a relatively recent acquisition by Crossroads, and Richard Goodson was the first facilities director, working there for about two years prior to the explosion. As the facilities director, he was responsible for maintaining the overall condition and safety of the property, which included maintaining the building, cleaning, and making minor repairs. More specifically, regarding the two boilers located at the facility, his responsibilities were to "shut them off when we didn't need heat and turn them back on when the heat season began."

---

[2] The record in the appeal numbered C-200391 also included the depositional testimony of Robert Coakley.

4

{¶6}     In December of 2015, Goodson called Cincinnati Air to come and look at the boilers after discovering that boiler 1 was leaking and boiler 2 was not coming on.[3]  This was the first time he experienced any issues with the boilers while working there.   The boilers had not been serviced prior to this time.   The boilers were inspected by the state inspector in September of 2015.

{¶7}     Goodson did not try to troubleshoot the issue himself or service the boilers at all, and no one else tried to service or troubleshoot the boilers before Cincinnati Air arrived.  When he contacted Cincinnati Air, he told them that boiler 2 was going into "flame out," which he described as referring to an indicator light, labeled "flame out," that would come on every time he turned the boiler on and it "went through a run through."  Once the light came on, the system would shut off.

{¶8}     Cincinnati Air came to Crossroads Westside to work on the boilers on three occasions: December 10, December 11, and December 14, 2015.   Goodson testified that two people arrived from Cincinnati Air to work on the boilers, but he did not recall who they were.[4]   On the first visit, they checked boiler 1 and determined condensation was coming from the boiler because of a cold fire start up issue.   They told Goodson this was normal, and it would dissipate after about an hour.  They then started diagnosing the issue with boiler 2.  They were at Crossroads Westside for around four hours the first day, and boiler 2 was still not working when they left.

{¶9}     On the second day, they continued to try to diagnose the issue with boiler 2.  When they left on the second day, they informed Goodson that parts were

---

[3] For convenience, the boilers will be referred to as boiler 1 and boiler 2.  Boiler 2 is the boiler that eventually exploded.
[4] Since the witness could not recall the names of the two individuals from Cincinnati Air, he generally referred to them as "they" throughout the deposition.  We will do the same here.

needed and that they would be sending a proposal of suggested repairs. On the third visit, they came out to get part numbers and give pricing. Goodson did not have any contact with them on the third day.

{¶10} Goodson was in and out of the room during the first two visits, so he could not testify to everything they did while they were there. However, he did observe them remove the cover to the control box, and observed them "flip-flopping" parts, such as the flame safeguard control and the control board, from boiler 1 to boiler 2. He never saw them change any wiring configurations within the control box. They advised Goodson that the flame safeguard control for boiler 2 was defective and not to use boiler 2.

{¶11} It took a few weeks after their last visit to get the proposal from Cincinnati Air. The proposal listed the flame safeguard control and several other parts to be replaced on boiler 2. The proposal concerned Goodson because he saw them place the flame safeguard control from boiler 1, the functioning boiler, on boiler 2, and boiler 2 still did not work. He was also concerned with the high price that was quoted in the proposal.

{¶12} Within a few days of receiving the proposal, Goodson called Blau for a second opinion. Two employees from Blau, John Heiert and Robert Coakley, arrived a few days later, but he is not sure what that date was. He knew the explosion occurred on January 6, 2016; however, he does not remember if Blau came out on more than one occasion. When Heiert and Coakley arrived, Goodson walked them through what he knew about what had been done prior to their visit. He told them that Cincinnati Air had been there and told them why he had called Blau. The flame safeguard control was intact on boiler 2 when they arrived.

6

**{¶13}** Heiert and Coakley worked on the boilers for several hours before the explosion occurred. Heiert was the technician, and Coakley was his helper. Goodson was with them the entire time. When asked about everything that Blau had done that day, Goodson testified as follows:

When I explained to John exactly what Cincinnati Air - to my knowledge exactly what Cincinnati Air had done as far as bringing parts from boiler number one to boiler number two, he started doing the same process and was taking parts from boiler number one over to number two, again to diagnose it to see if it would come on.

When he took the flame guard sensor loose from boiler number two, he told me to look at it, and there was a washer that was down inside of the casing of the flame sensor. He said, I bet that's your problem. That may fix it right now. He pulls the washer out. He said the washer didn't belong there. He said that that may be disrupting the eye where it couldn't see the flame. So he took that out, put it back together, went to fire it up. Nothing. It did the same thing, flame-out. So then he took the one from boiler number one and placed it on boiler number two, and he had the same results that Cincinnati Air had all the way through all the testing.

Then from that point, he was doing some diagnosing as far as trying to find out if the control was sending a call to -- a call for heat. Then he went from that point, he said that he was not getting a call for the gas valve to open, so he was not sure whether it wasn't getting a call for it to open or if it wasn't operating, if the gas valve was defective.

Then he said that he was going to wire the gas valve where it would operate without being called from the control unit. So he wired -- and I'm not exactly sure what he did in the control panel, but he wired the gas valve to where it got power straight through to it. Then there's a flow meter that's on the gas valve, and the little thing that's in the flow meter pegged. It we [sic] went straight up. And he said, well, that shows me that the gas valve is operating because the flow meter pegged.

Like I said, from that point, I'm not sure what he wired or didn't, because he just started diagnosing more and more things. He tried to fire it up a couple more times, and there was no issue -- I mean no fire up. Still had the same problems.

And then our-the FI director, Joe Curry, came downstairs. He had just got there from Oakley and was just wanting to see what was going on. I was talking to him when the campus pastor walked in, and John was still down and still diagnosing. And I was talking to Greg McElfresh, which is the pastor, and we walked over in front of the boiler, and I was explaining to Greg everything that John had gone through, and that he had basically mirrored everything that Cincinnati Air had done.

As I was talking to Greg, he was running it through another sequence, and that's when the explosion occurred.

{¶14} Goodson further explained that, when Heiert had the cover of the control box removed, he was using a meter to check for power and sequences. He testified that Heiert "explained to me that he was sending a signal straight through to

8

open the gas valve up to bypass any of the calls, and that was to confirm that the diaphragm was opening on the gas valve." He did not see Heiert remove the oil/gas toggle switch. He did not know what wiring was done, whether the wiring was ever put back to the original configuration, or if Heiert installed the jumper wire. He never saw Heiert prepare a jumper wire.

{¶15} While Heiert was working on the boiler, Coakley was going behind the boiler to check for a flame. He was standing to the right of the boiler when the explosion occurred. Coakley never touched anything within the control box. No one other than Heiert had access to the control box on boiler 2 on the day of the explosion.

{¶16} Goodson denied that anything was done to boiler 2, by himself or anyone else, from December 14, 2015, to January 6, 2016. He also denied ever removing the cover to the control box on boiler 2 or ever installing a jumper wire on any boiler. He was not aware of anything that Cincinnati Air did or failed to do that would cause the boiler to explode.

*Affidavit and Depositional Testimony of Mike Cordeiro*

{¶17} Mike Cordeiro is a service technician for Cincinnati Air. He first arrived at Crossroads Westside on December 10th. He testified that he was alone on the first day. He met with Goodson when he first arrived. Goodson informed him that the boilers were leaking water and "tripping on the flame safeguard." The first thing he did was look at the leaking issue. He discovered that neither boiler was leaking and that it was just a condensation issue. He then started troubleshooting the other problems by checking the safeties and checking electrical connections. He also looked at the reducing valves and cleaned the screens. Goodson was not in the

room with him the whole time he was there. Cordeiro did not discover any issues on the first day.

{¶18} Cordeiro was also alone when he came back the next day. Goodson was around a little bit, but Cordeiro was mainly by himself. Cordeiro cleaned the UV sensors on both boilers, and this fixed the issue with boiler 1. He denied switching out any parts on either boiler. He could not recall if he removed any switches, or if he noticed anything unusual that should not have been there when he looked inside the burner control. He continued to check voltages and connections and tried to cycle boiler 2 several times that day. He eventually removed the flame safeguard from boiler 2 and took it to a local supply house to have it tested. The test failed, which meant the part needed to be replaced. He went home for the day after the test was complete. The flame safeguard remained in his work truck until he returned on December 14th.

{¶19} On December 14th, he performed maintenance on the boilers, such as greasing pumps, checking safeties, and checking the operation of the boilers. He also brought the flame safeguard control back and placed it on top of the control box. He did not reinstall the flame safeguard control onto boiler 2 before he left. He left the boiler with no gas or electricity running to it. He did not see a jumper wire on the boiler and could not say whether the jumper wire was in place on the boiler when he was there. He denied ever fashioning a jumper wire or installing a jumper wire on boiler 2.

{¶20} In his affidavit filed with Cincinnati Air's motion for summary judgment, Cordeiro again denied installing the jumper wire on boiler 2.

*Depositional Testimony of John Heiert*

{¶21} John Heiert is a service technician with Blau. When he arrived at Crossroads, Goodson told him the boiler had been "down" and that Cincinnati Air had been there to work on it. He then walked into the boiler room and saw two identical boilers. He suggested to Goodson that they "swap" the flame safeguard to see if it worked, and Goodson told him Cincinnati Air had already tried swapping the flame safeguard and the UVI. However, he told Goodson he wanted to see if for himself.

{¶22} Heiert determined the flame safeguard control from boiler 2 was functional by swapping the parts between boiler 1 and 2. When he swapped the parts, boiler 1 still fired up and boiler 2 still did not. Heiert described the story of what happened that day as follows:

> Well, like I said, when we walked down in there, me, Richard, and Robert—we were talking about everything that was going on. Then I went out and got my tools, my tool bag, and we started doing the service work.
>
> After a visual inspection—I visually inspect everything around the boiler to make sure there's nothing obvious.
> But I started on the service work, and that's when I changed out the flame safeguard and the I—the UVI. We found that those [were not] the problem.
>
> Then I went through and I had to take all of the covers off all of the four-by-four junction boxes, all the safeties around the boiler so I could get to the wiring to check voltages, and I wanted to check continuity on all of the safeties.

11

So I did all of that, and then I wanted to check to make sure—I didn't know if that boiler runs straight off its limits or if it has a VAS system. I had never been there before. I didn't know what controlled it. So I had to spend some time on looking into that.

Then once I found out all of the safeties and stuff were made and we knew that it wasn't that, we could eliminate that, you start working back to the burner.

And then in that time frame when I had the burner cover off and I was in there—and I turned the boiler off with the disconnect on the side of the boiler—because when you swap parts, you want to do that because its three-phrase electric inside there, and you don't want to get lit up, so power down at the disconnect.

\* \* \*

Well, in the midst of checking all of the safeties and finding out they were good, when I went to the burner in the front and I started checking voltage inside the burner cabinet itself, that's when—I had the disconnect on for the last time.

I don't know how long the time—it must have been, I guess, a good amount of time, I don't know how long, and then when I went to flip the switch on—because you have to have it on so you can check voltage—and when the boiler went to line off, I don't remember a whole lot after that.

{¶23} Heiert testified that the flame safeguard was intact on boiler 2 when he arrived. He did not notice anything unusual about the wiring configuration or the switches. The only thing he noticed was that the boilers were old, looked like they

had not had much maintenance done, and were not well maintained. He testified that the oil/gas toggle switch was in place when he got there. At the time of the explosion, he was using a voltmeter to check continuity. He connected his voltmeter to the boiler and then turned on the toggle switch. The boiler went through its cycle and that was when the explosion occurred.

{¶24} He denied altering the wiring at any point. He admitted he removed/ lowered the toggle switch because he could not get his leads "in there to check voltages," but denied changing the wiring to the toggle switch when he removed it. He also denied installing a jumper in the burner control. He admitted he does not know who installed the jumper wire, or when the jumper wire was installed. He denied being aware of any evidence that Cincinnati Air negligently performed service work on the boiler at issue or left the boiler in an unreasonably dangerous condition, and admitted he has no idea if Crossroads or anyone on its behalf did or failed to do anything to cause the explosion.

*Depositional Testimony of Brad Davis and Report of Envita Forensics*

{¶25} Brad Davis works for Envita Forensics ("Envita"). Envita was retained by Brotherhood Insurance to determine the cause of the boiler explosion. Davis's depositional testimony mainly discussed Envita's report. The conclusions in the report were:

1) It was discovered that a black jumper wire was attached to the oil/gas toggle switch that opened the natural gas at the beginning of the burner start up sequence. This allowed natural gas to enter the boiler during the air purge sequence and when the pilot light was lit. This caused the explosion to occur within the boiler.

2) No evidence was discovered that any employee of Crossroads Community Church installed this black jumper wire on the oil/gas toggle switch.

3) The black jumper was installed during Blau Mechanical's troubleshooting prior to the explosion.

*Depositional Testimony and Report of Mark Sokalski*

{¶26} Mark Sokalski is a licensed engineer and the senior project manager at Civil and Environmental Consultants, Inc. Sokalski was retained by the plaintiffs' counsel to determine the proximate cause of the explosion. The conclusions in Sokalski's report are as follows:

1) The proximate cause of the explosion was the installation of an electrical black jumper wire from terminal 4G to GV. This jumper wire permitted the main gas valve to fully open any time the main control switch (S1) was turned on.

2) While it is common during troubleshooting to temporarily install an alligator type jumper wire around a safety device to check the operation, no permanent jumper wire should ever be installed.

3) The installer of this black jumper wire, bypassing at least eight safety interlock and directly activating the main gas valve, is presently unknown.

4) John Heiert did not install this black jumper wire.

5) Insufficient evidence exists, at the present time, as to determining who installed this black jumper wire.

14

{¶27} Sokalski testified that "[t]he proximate cause is that an actual wire existed energizing the fuel valve without the ignitor. * * * Bypassing the ignitor system. Typically, the pilot has to be on before the gas valve will open. This jumper wire opens the gas valve, and then any time you would do anything inside the electronics and create an ignition source or arching on the ignitor, it's going to explode. So that was the proximate cause."

{¶28} Importantly, when preparing his report, Sokalski only relied on the deposition testimony of Heiert. He did not review the testimony of any other witness or review the fire department reports. He admitted it would be important to review the other witness testimony before determining who may be responsible for the explosion. He spoke to Heiert personally at the accident site and Heiert told him he "didn't touch anything except move the controllers back and forth." When he discussed his conclusion that Heiert did not place the jumper wire, he stated:

> Well, I went through my evidence and my chronological turn of events and based on the fact that it was hard wired in and from his testimony, I made the determination that he couldn't have known that it existed. Either that or he was suicidal. And to me, that just didn't sound logical that he would have put the wire on to keep the gas valve wide open through the entire purge process and then decided to -- while its running to throw a match to it. That doesn't sound logical. I came up with the determination based on the chronological turn of events -- and from what he told me on the first day that that's all he did and didn't touch anything else on the system, that indicated that he didn't put the wire on, so that was my conclusion.

**{¶29}** He admitted he never asked Heiert directly if he installed the jumper wire and admitted that he did not see Heiert's testimony that he removed the gas/oil toggle switch. Thus, Sokalski conceded during his deposition that it's possible that Heiert did install the jumper wire. He then refined his answer and stated:

I didn't suspect he did, but now that you have that he took that out of there, then that means it goes back to what was the work that was done on this prior. It doesn't mean he did. It does mean that somebody -- somebody removed it at some point in time and put the wire on -- could have put it back in there, but I can't answer that because I don't have enough evidence one way or the other.

**{¶30}** After reviewing portions of Goodson's testimony during the deposition, Sokalski admitted that Goodson's testimony that Heiert told him he was rewiring the gas valve was "significant because that would be similar to what the jumper wire left in there was doing." Thus, he admitted there were "implications" that Heiert installed the jumper wire. He also admitted he did not have enough information to say who installed the jumper wire and did not have any evidence that Crossroads or Goodson did anything to cause the explosion.

*Affidavit of Richard Kovarsky*

**{¶31}** Richard Kovarsky was retained by plaintiffs' counsel to determine the factor or factors which led to the boiler explosion. In his affidavit, Kovarsky noted that the jumper wire was hard wired onto the switch and would not have been readily visible because the switch was installed in the boiler control panel. He also noted that installing the jumper wire would require the switch to be removed from its mounting location, and Heiert was the only one who acknowledged removing the switch. However, he believed Heiert had no reason to install the jumper because the

16

use of a hardwired jumper did not make sense for the type of troubleshooting that Heiert was conducting.

{¶32} Kovarsky concluded, "[I]t is my opinion, to a reasonable degree of engineering certainty, that the source of the natural gas that resulted in the explosion that injured Mr. Heiert was the release of gas through the main gas valve due to a jumper on the oil/gas toggle switch which constantly energized this value as long as there was power to the boiler. The exact ignition source for the gas is currently undetermined." Additionally, Kovarsky stated:

My analysis further finds that there is credible evidence to indicate that another party had worked on the boiler after Mr. Corderio's [sic] service calls in mid-December 2015 and the arrival of Mr. Heiert on January 6, 2016. The facts and evidence in this matter are consistent with this party having installed the jumper on the oil/gas toggle switch. The available information indicates that this party would either be Mr. Corderio [sic], Mr. Goodson, or some other party that was known to Mr. Goodson.

*Depositional Testimony of Richard Kovarsky*

{¶33} Kovarsky is a registered professional engineer and the owner of Pyro-Technical Investigations, a forensic engineering firm. Kovarsky formed his opinion based on the discovery conducted in the case.

{¶34} Kovarsky agreed that the jumper wire would have been "readily visible or at least visible" when Heiert removed the oil/gas toggle switch from its mount. He elaborated on the opinion in his affidavit that Heiert would have had no reason to install the jumper wire and stated, "I have no idea as to why anyone would have installed this particular jumper." He did not know (1) why they would use a hard-

wired jumper, and (2) why they "jumpered" the terminal that they did. Thus, he conceded during his testimony that he also could not think of a reason why Cordeiro would install the jumper, and that a lot of the reasoning he relied on for his opinion that Heiert did not install the jumper wire would also apply to Cordeiro. He stated, "As it relates to this particular issue, no, I'm not suggesting Mr. Cordeiro was the person who installed the jumper."

{¶35} Kovarsky opined that the inconsistencies in testimony "strongly suggest" someone else did something with the boiler between the time that Cincinnati Air was at Crossroads and when Blau arrived. However, he also admitted the hard-wired jumper "wound up serving a purpose like" what Heiert allegedly told Goodson he was going to do right before the explosion. Thus, he agreed that Goodson's testimony is "certainly consistent" with a jumper wire potentially being installed by Heiert, but added, "It does not necessarily say that it was this jumper that was installed."

{¶36} Kovarsky admitted he has no evidence that Cincinnati Air installed the jumper, and that there is no evidence "at this point" to directly say Goodson installed the jumper wire.

## Law and Analysis

### Standard of Review

{¶37} We review the granting of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) the evidence, when viewed in favor of the nonmoving party, permits only one reasonable conclusion and that

conclusion is adverse to the nonmoving party. *Evans v. Thrasher*, 1st Dist. Hamilton No. C-120783, 2013-Ohio-4776, ¶ 25.

{¶38} The initial burden is on the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact as to the essential elements of the case. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). If the moving party meets its initial burden, the burden shifts to the nonmoving party to set forth specific facts to show there is a genuine issue of material fact. *Id.*

*First Assignment of Error*

{¶39} In the first assignment of error, plaintiffs-appellants argue that the trial court erred by granting summary judgment in favor of defendants-appellees.

{¶40} To establish actionable negligence, one must show (1) the existence of a duty, (2) breach of that duty, and (3) an injury resulting proximately therefrom. *Ellis v. Time Warner Cable*, 1st Dist. Hamilton No. C-120083, 2013-Ohio-240, ¶ 6, quoting *Menifee v. Ohio Welding Prod., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984). "If, in response to a properly supported [summary judgment] motion, the plaintiff fails to meet its evidentiary burden of setting forth facts from which reasonable minds could find all three elements, then the defendant is entitled to summary judgment as a matter of law." *Williams v. 312 Walnut Ltd. Partnership*, 1st Dist. Hamilton No. C-960368, 1996 WL 741982, *2 (Dec. 31, 1996).

{¶41} In this case, defendants-appellees moved for summary judgment, alleging that plaintiffs failed to present any evidence to show that any defendant was the cause of the explosion. Plaintiffs-appellants responded first by pointing to inconsistencies between the testimony of Cordeiro and Goodson regarding the actions taken by Cordeiro while at Crossroads. Next, plaintiff pointed to the fact that

19

Cordeiro was working on the boiler alone most of the time, while Goodson was in the room with Heiert the entire time. Lastly, they relied on the affidavit of their expert Kovarsky to show a "likelihood" that Goodson, or someone under his direction, "tampered" with the boiler between the time when Cincinnati Air was there and when Blau arrived. Essentially, plaintiffs asserted that the evidence showed that each defendant had the opportunity to install the jumper wire, and therefore, the issue of who actually installed the jumper wire should be an issue left for the trier of fact.

{¶42} However, " 'mere speculation or possibility is not enough to defeat a summary judgment motion.' " *Wynn v. Duke Energy Ohio, Inc.*, 1st Dist. Hamilton No. C-130781, 2014-Ohio-3464, ¶ 15, citing *Allstate Ins. Co. v. Sears Roebuck Co.*, 7th Dist. Belmont No. 06 BE 10, 2007-Ohio-4977, ¶ 74. "[T]here must be direct proof of a fact from which [an] inference can *reasonably* be drawn." *Parras v. Standard Oil Co.*, 160 Ohio St. 315, 319, 116 N.E.2d 300 (1953).

{¶43} Here, plaintiffs-appellants failed to point to any fact in the record from which a reasonable inference can be drawn that any of the defendants actually installed the jumper wire. Evidence of access and opportunity can only reasonably establish that it is *possible* one of the defendants installed the jumper wire, and this is insufficient to defeat a summary-judgment motion. Therefore, we overrule the first assignment of error.

*Second Assignment of Error*

{¶44} In the second assignment of error, plaintiffs-appellants argue that the trial court erred by failing to apply the doctrine of res ipsa loquitor to the boiler explosion.

**{¶45}** Res ipsa loquitor is "a rule of evidence which permits the trier of fact to infer negligence on the part of the defendant from the circumstances surrounding the injury to plaintiff." *Hake v. George Wiedemann Brewing Co.*, 23 Ohio St.2d 65, 66, 262 N.E.2d 703 (1970). For the doctrine to apply, a plaintiff must show "(1) [t]hat the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed." *Id.* at 66-67.

**{¶46}** The doctrine is not restricted solely to factual situations involving a single defendant. *Shields v. King*, 40 Ohio App.2d 77, 81, 317 N.E.2d 922 (1st Dist. 1973), citing *Bauer v. Pullman Co.*, 8 Ohio App.2d 1, 220 N.E.2d 366 (10th Dist. 1966), and *Dearth v. Self*, 8 Ohio App.2d 33, 35-36, 220 N.E.2d 728 (4th Dist.1966). It may be applied to factual situations involving multiple defendants where the defendants were acting in concert and were in collective and concurrent control of the instrumentality which caused the injury. *Id.* It may also be applied in situations where one defendant is vicariously liable for the other defendant. *Dearth* at 36. However, the doctrine should not be applied to situations where: (1) multiple defendants have been involved, because the wrongdoer could not be identified; (2) where one of two defendants wholly independent of the other might be responsible for the injury; or (3) where, under the facts, only one defendant might have been negligent. *Id.* at 35.

**{¶47}** Thus, "as a general proposition, where there are multiple defendants, any one of whom might have been at fault, it is ordinarily not proper to say that anyone had exclusive knowledge as to how or why the accident occurred." *Id.* at 36.

21

Additionally, "if some other person or persons, other than the named defendants, had even partial control of the [instrumentality], the inference permitted by res ipsa loquitur would be improper." *Eannottie v. Carriage Inn of Steubenville*, 155 Ohio App.3d 57, 2003-Ohio-5310, 799 N.E.2d 189, ¶ 43 (7th Dist.).

{¶48} Here, there is no evidence to establish when the jumper wire was installed and multiple parties, including the plaintiffs, may be at fault for installing the jumper wire. Additionally, Heiert, the plaintiff, was in control of the boiler at the time of the explosion. Thus, it cannot be shown that any defendant was in exclusive management and control of the boiler at the time of the explosion or at the time when the jumper wire was installed. There is also no evidence that the defendants were acting concurrently or in concert. Therefore, the application of res ipsa loquitor would be improper in this case. Accordingly, we overrule the second assignment of error.

## Conclusion

{¶49} Having overruled both assignments of error, we affirm the judgments of the trial court.

Judgments affirmed.

**BERGERON** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its own entry this date.