[Cite as *Schultz v. Ohio Dept. of Rehab. & Corr.*, 2022-Ohio-4591.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Nancy G. Schultz et al., | : | |
| Plaintiffs-Appellants, | : | No. 22AP-86 |
| | | (Ct. of Cl. No. 2015-00043JD) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio Department of Rehabilitation and Correction, | : | |
| | : | |
| Defendant-Appellee. | : | |
| | : | |
| Andrea K. Hawley et al., | : | |
| Plaintiffs-Appellants, | : | No. 22AP-88 |
| | : | (Ct. of Cl. No. 2015-00042JD) |
| v. | : | |
| | : | (REGULAR CALENDAR) |
| Ohio Department of Rehabilitation and Correction, | : | |
| | : | |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 20, 2022

**On brief**: *Arthur C. Graves*, for appellants. **Argued**: *Arthur C. Graves*.

**On brief**: *Dave Yost*, Attorney General, and *Eric A. Walker*, for appellee. **Argued**: *Eric A. Walker*.

APPEALS from the Court of Claims of Ohio

McGRATH, J.

{¶ 1} In these consolidated appeals, plaintiffs-appellants, Nancy G. Schultz and Andrea K. Hawley (collectively "appellants"), appeal from a judgment of the Court of Claims

of Ohio in which that court overruled appellants' objections to a magistrate's decision following a bench trial, and entered judgment in favor of defendant-appellee, Ohio Department of Rehabilitation and Correction ("ODRC").

{¶ 2}   On January 21, 2015, appellants filed a complaint against ODRC asserting causes of action for negligence and loss of consortium.  The complaint alleged that appellants, while working at the Ohio Reformatory for Women ("ORW") during the early morning hours of February 4, 2010, were negligently exposed to toxic fumes, vapors, and chemicals.

{¶ 3}   The matter came for trial before a magistrate of the Court of Claims beginning February 24, 2020.  The following facts are taken primarily from the decision of the magistrate following the bench trial.  On February 4, 2010, appellant Nancy G. Schultz (individually "appellant Schultz") and appellant Andrea K. Hawley (individually "appellant Hawley") were working at ORW "as contract employees for HealthPro, Inc., in the pharmacy at ORW, which is operated by [ODRC]."  (Mag. Decision at 1.)  The pharmacy, which is "located in the Medical Services Building[,] * * * shares a wall with the adjacent food service portion of the building."  (Mag. Decision at 2.)

{¶ 4}   Appellants testified that, "on the morning of the incident, they were performing their usual job duties when they, along with several other employees and inmates of ORW, were exposed to an unknown substance which caused numerous injuries."  According to appellants, "other occupants of the building had the same or similar experiences and injuries."  Prior to the incident, "odors emanating from the food service side of the building were readily noticeable in the Medical Services area."  (Mag. Decision at 2.)

{¶ 5}   On the morning of the incident, appellant Hawley "began her workday by performing her typical morning duties"; as she was cleaning, "she began to notice a strong odor which she described as much like that of 'burning wires.' "  Appellant Hawley "related that pharmacy personnel would often smell food being prepared in the food services building, but the odor she smelled that day was unlike any odor * * * she had ever smelled before in the pharmacy."  She "began to investigate the odor, and as she attempted to ascertain whether the source was the ventilation system, she lost consciousness."  Appellant

Hawley next recalled "awaking on the floor in the hallway," and medical personnel gave her "supplemental oxygen and candy to raise her blood sugar." (Mag. Decision at 2.)

{¶ 6} Two other witnesses, Judy Pendleton and Samantha Easton "testified they were working in the pharmacy that morning and both had noticed the odor and witnessed Hawley fall unconscious shortly after she mentioned the odor." (Mag. Decision at 2.)

{¶ 7} Appellant Hawley "was taken to Memorial Hospital where her vital signs were monitored and a urinalysis was performed." (Mag. Decision at 2.) She "testified that a representative from ORW arrived at the hospital that morning and indicated that the cause of her symptoms was a chemical reaction from cleaning in the pharmacy with an alcohol swab." Appellant Hawley was released from the hospital and "rested at home and returned to work the next day, Friday." However, upon returning to work, "she was again sent to the emergency room for breathing complications." (Mag. Decision at 3.)

{¶ 8} Appellant Hawley testified "that she was 'afraid' and it 'hurt to breathe.' " She was again examined and provided supplemental oxygen; she "spent the weekend recovering and * * * contacted other employees at ORW to determine if they had any information on the cause." Appellant Hawley returned to work on March 9, 2010, and "worked for one month without incident." On April 9, 2010, "she again detected an odor in the pharmacy area"; the odor that day was "similar to the smell she had experienced on February 4," and she "obtained additional treatment after the second alleged exposure in April." (Mag. Decision at 3.)

{¶ 9} Appellant Schultz testified that she arrived at work "around 7:15 a.m." on February 4, 2010, and "began to perform her usual duties as a pharmacist." The weather that morning was "foggy and cold," and she "began using an alcohol pad to remove stickers, which had been used in medication labeling, from the floor of the pharmacy." Around this time, appellant Hawley "informed a coworker in the pharmacy that she noticed an odor." Appellant Schultz "testified that she had smelled a strong odor in the pharmacy that morning," and she was "in close proximity to Hawley when she overheard her comment on the unusual odor," and "she subsequently observed Hawley fall unconscious." (Mag. Decision at 3.)

{¶ 10} After providing aid to appellant Hawley, appellant Schultz "pressed the 'man-down' button, an emergency signaling device, to alert the staff and get aid from a nurse for

Hawley." Appellant Hawley "regained consciousness, her vital signs were assessed, and supplemental oxygen was administered." A short time later, appellant Schultz and "other building occupants were evacuated from the building." When appellant Schultz arrived outside, "Dr. Vincent Spagna, a physician for ORW, began an examination and administered a vision test to Hawley, asking her to follow his finger with her eyes." (Mag. Decision at 3.) According to appellant Schultz, "Hawley was unable to comply with Dr. Spagna's direction." (Mag. Decision at 3-4.) Aside from "noticing the odor," appellant Schultz "experienced no adverse health effects while in the pharmacy." (Mag. Decision at 4.)

{¶ 11} After appellant Hawley was transported to the hospital, appellant Schultz "returned to the pharmacy to lock up"; she described the situation as " 'chaotic' and she assisted in transporting medical supplies to various other buildings on campus where others had congregated." Although stating "she had experienced no adverse symptoms up to that time," appellant Schultz "testified that when she entered the Harmon Building she began to experience symptoms similar to Hawley." Appellant Schultz "experienced tremors, felt dizzy, and had a metallic taste in her mouth." She also "began to smell something like 'sulphur' in the Harmon [B]uilding." Appellant Schultz "remained conscious throughout the entirety of the incident." (Mag. Decision at 4.)

{¶ 12} After experiencing the symptoms inside the building, appellant Schultz "was immediately taken outside and sent to the hospital via ambulance," and she "recalled being given pain medication and supplemental oxygen." Later that day, after receiving approval from ORW officials to return to work, appellant Schultz "drove herself from the hospital to ORW, collected her personal items, and then drove home." She "returned to the emergency room that evening because she still experienced headaches and elevated blood pressure." At the hospital, appellant Schultz "was evaluated with a number of tests, none of which identified any toxin or chemical in her system." She "remained at home until returning to work in April." (Mag. Decision at 4.)

{¶ 13} Appellant Schultz "recalled a strong smell that she detected at ORW for three days in April, but she did not know the source." (Mag. Decision at 4.) She "described the location of the employee bathrooms in the medical services building, which shared a wall with a room housing both the x-ray machine and mammogram machine"; also "stored there

were multiple large drums which contained chemicals that were used in the machines." Appellant Schultz "testified that it 'always smelled like chemicals back there,' " and she "described the damage to the bathroom wall which she suspected could have been caused by chemicals leaking from the drums." (Mag. Decision at 4-5.) Appellant Schultz "also confirmed that on the morning of the incident, she cleaned stickers from the floor of the pharmacy, using an alcohol pad and a spatula." She "also described two previous incidents at ORW where she had detected a strong odor; however, she did not get ill from either of those incidents." (Mag. Decision at 5.)

{¶ 14} Richard Crawford, a "maintenance manager" at ORW, "described the manner in which maintenance records were maintained in work order logs." He testified that "preventative maintenance was performed on all systems at ORW, including the heating, ventilation, and air-conditioning mechanical system (HVAC system) for the medical services building." In January 2010, "preventative work had been performed on the portion of the HVAC system responsible for drawing in inside air, the air-handler 2 (AH-2) system," and Crawford testified that "no problem with the system was discovered." Crawford "further testified that any complaints of gas or odors would have been reported to both himself and the ORW safety coordinator" but that, "after a review of the work order log, * * * no complaints were recorded in the log pertaining to noxious smells or odors." (Mag. Decision at 5.)

{¶ 15} Mark Smith was employed by ORW as "the Health and Safety Coordinator," and he was "a member of the biohazard team at ORW." In his role as Health and Safety Coordinator, Smith "was to be directly notified of any incident involving either spills or leaks, or any event impacting employee safety." (Mag. Decision at 5.)

{¶ 16} On the morning of February 4, 2010, Smith "received a call on his radio and he immediately responded to the medical services building to investigate." Smith testified that, upon arriving, he "observed 'mass panic' unfolding as employees and staff were informed they were required to evacuate the building." (Mag. Decision at 5.) Smith, who contacted the Marysville Fire Department, testified "he did not detect any unusual or noxious odors in or near the building, * * * and he went room-to-room in the medical services building looking for any employees who had not evacuated the building." Smith

"did not experience any adverse health effects during or after searching the building." (Mag. Decision at 5-6.)

{¶ 17} At around the time Smith completed his inspection, "four fire department employees arrived and searched the medical services building, including the pharmacy, but they did not detect any gas leak or other suspicious odor in the building." Smith "also contacted Columbia Gas, but their technicians were unable to detect either any unusual odors or any source of noxious gases. Notably, the Columbia Gas technicians checked AH-2 for any detectable levels of gas, but none were found." Upon "clearing the entire medical services building, Smith and the technicians performed a sweep of the Harmon [B]uilding for possible sources, but they failed to detect any gas, chemicals, or odors." (Mag. Decision at 6.)

{¶ 18} Smith testified that, following his investigation, "he prepared an incident report in accordance with ORW policy"; in the report, Smith "documented that neither he, the Marysville Fire Department, nor the team from Columbia Gas detected any odors, nor did they identify any potential sources of the odor." The report also "identified both an alcohol pad that was used to clean a black stain on the floor and subsequent chemical reaction as the likely cause of the odor." (Mag. Decision at 6.)

{¶ 19} During his testimony, Smith "confirmed * * * that on February 6, food services coordinator Juanita Williams decided to leave work because she had symptoms similar to those others had experienced on the morning of February 4," and Smith also confirmed that "on February 8, Schultz had left work because she had also experienced similar symptoms as she had four days prior." After learning of these incidents, Smith "performed additional investigations into the potential cause." He "further testified regarding his knowledge of the chemical storage and the damage to the wall located behind the shared wall of the pharmacy." Smith testified that "no chemicals had leaked, and that damage to the shared wall was caused by a pipe in the bathroom wall that had burst." (Mag. Decision at 6.)

{¶ 20} At trial, appellants presented "multiple theories as to both the identity and their exposure to the substance that caused their injuries." (Mag. Decision at 6.) In addition to the theory they were exposed to chemicals present in the pharmacy, appellants asserted "that another possibility for the route of exposure to a hazardous substance was

the improper design and construction of the HVAC system of the building." Appellants offered "two alternative ways by which the design and construction of the HVAC system could have resulted in their injuries," suggesting first that "the AH-2 operated such that potentially contaminated air originating in the food services area would be drawn directly into the system and redistributed throughout the building, thus circulating the unknown substance from the kitchen into the pharmacy area." Second, appellants alternatively suggested "the AH-2 may have similarly introduced contaminated outside air into the internal system, thereby spreading the substance throughout the building." (Mag. Decision at 7.)

{¶ 21} Appellants "offered the expert testimony of Lee Martin, a forensic architect who reviewed the design and construction of the HVAC system at ORW." Appellants also "offered verified weather reports which indicate that, during the morning of the incident, a heavy fog was present at ORW." At trial, Martin "testified that the presence of fog would have resulted in reduced atmospheric circulation, thus increasing the likelihood that any airborne [contaminant] would have been drawn into the HVAC system." According to Martin, "in commercial HVAC systems such as those servicing the medical services building at ORW, air circulated throughout the building must contain 4-8% fresh air drawn in from the outside atmosphere, while the remaining 92-96% of air in the HVAC system is pulled in and internally recirculated." (Mag. Decision at 7.)

{¶ 22} Martin stated that "the external air handlers located on top of the medical services building did not conform with the Ohio Mechanical Code because they were located too close in proximity." According to Marin, the "intake and exhaust air could have mixed together resulting in contaminated air being drawn back inside the building." He "further testified that the schematics of the HVAC system show that the exhaust air from the kitchen was drawn into the ventilation system where it subsequently passed over the pharmacy area before entering AH-2." (Mag. Decision at 7.) Appellants argued that "either theory described by Martin could have caused an airborne contaminant to circulate from one area of the building, or outside thereof, to the pharmacy." (Mag. Decision at 7-8.)

{¶ 23} ODRC's expert witness, Lane Beougher, "is a former State Architect of Ohio and a program manager for the Ohio Utilities Construction Commission." (Mag. Decision at 8.) At trial, Beougher testified that, "according to records he reviewed from the former

state architect's office, the HVAC system in the ORW Medical Services building was properly assembled and installed." Beougher further testified that ODRC "was not directly responsible for the design and construction of the HVAC system"; at trial, he "described the process for completing a large state construction project." (Mag. Decision at 8.)

{¶ 24} According to Beougher, "between 2002 and 2004, when the facility was constructed, the state's architect office was required to coordinate and approve the overall project, including approving plans submitted by the contractors and engineers." In addition, "the Department of Commerce approved the design and plans for the facility" and, "[u]nder the umbrella of the state's architect office, the build plans were provided to Renouveau Design, Inc., which was hired as an architectural consultant on the project." Renouveau subsequently "hired an engineering firm to design the HVAC for the facility, which in turn hired a mechanical subcontractor to install the system." (Mag. Decision at 8.)

{¶ 25} Beougher testified that "although [ODRC] took control of the facility once the build was completed, it had relatively minor input as to the overall design of the facility and [ODRC] would have had no control over the design, construction, or installation of the HVAC system at ORW." Beougher further testified that ODRC "did not provide final approval of the building plans, nor was it responsible for inspecting and ensuring mechanical systems, such as HVAC, were properly configured and installed." Rather, he stated, "the Ohio Bureau of Code Compliance and the State Fire Marshal had that responsibility." (Mag. Decision at 8.)

{¶ 26} On January 21, 2021, the magistrate issued a decision finding that appellants failed to meet their burden of proof in showing ODRC liable for negligence, and thus found in favor of ODRC on the claims for negligence and loss of consortium. On February 3, 2021, appellants filed objections to the magistrate's decision. On January 10, 2022, the Court of Claims rendered a decision overruling appellants' objections and adopting that decision.

{¶ 27} On appeal, appellants set forth the following five assignments of error for this court's consideration:

> [I.] The Trial Court and the Magistrate erred in failing to find
> that the Defendant breached a duty to "furnish employment
> which is safe for the employees engaged therein" as required by

R.C. 4101.11. The Trial Court and Magistrate further erred in failing to find that the Defendant breached a duty "to do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees or frequenters[,]" as required by R.C. 4101.11.

[II.] The Trial Court and the Magistrate erred in not applying the doctrine of res ipsa loquitur to the established facts in this case.

[III.] The Trial Court and Magistrate erred in finding credible Dr. Jolliff's opinion that the "constellation of symptoms described by plaintiffs were not of the type typically caused by any toxic exposure, but rather are indicative of the body's natural response to stressful situations."

[IV.] The Trial Court and [M]agistrate erred in finding that "...the series of events that occurred beginning on the morning of February 4 could be attributable to a reason other than the defendant's negligence."

[V.] The Trial Court and Magistrate erred in finding that "Plaintiffs failed to establish that a deviation from the plan resulted in any defect in the system which would constitute a b[r]each of defendant's duty to maintain the premises in a reasonably safe manner."

{¶ 28} Appellants' first and fifth assignments of error are interrelated and will be considered together. Under these assignments of error, appellants assert the magistrate and Court of Claims erred: (1) in failing to find ODRC breached a duty to furnish safe employment under R.C. 4101.11, and (2) in finding appellants failed to establish that a deviation from a building plan specification resulted in a defect in the system which would constitute a breach of ODRC's duty to maintain the premises in a reasonably safe manner.

{¶ 29} In accordance with Civ.R. 53, a trial court "reviews a magistrate's decision de novo." *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 6, citing *Mayle v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-541, 2010-Ohio-2774, ¶ 15, citing *State Farm Mut. Auto. Ins. Co. v. Fox*, 182 Ohio App.3d 17, 2009-Ohio-1965, ¶ 10 (2d Dist.2009). In ruling on objections to a magistrate's decision, a trial court "must undertake an independent review of the matters objected to in order 'to ascertain [whether] the magistrate has properly determined the factual issues and appropriately

applied the law.' " *Id.*, quoting Civ.R. 53(D)(4)(d). By contrast, "[a]n appellate court * * * applies an abuse of discretion standard when reviewing a trial court's adoption of a magistrate's decision." *Id.*, citing *Mayle* at ¶ 15, citing *State Farm* at ¶ 11. Further, "[c]laims of error by the trial court must be based on the trial court's actions, rather than on the magistrate's findings." *Id.*, citing *Mayle* at ¶ 15.

{¶ 30} Further, with respect to manifest weight challenges "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence." *Id.* at ¶ 31, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. In "applying this standard of review, an appellate court must presume the findings of the trier of fact are correct because it is best able to observe the witnesses and use those observations in weighing the credibility of the testimony." *Id.*, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 31} Under Ohio law, the elements of a negligence claim are: "(1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach." *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, ¶ 22, citing *Mussivand v. David*, 45 Ohio St.3d 314, 319 (1989).

{¶ 32} The parties in this case do not dispute the fact that appellants, at the time of the events, were employees of an independent contractor. In general, "[w]hen performing work on the premises of the employer, an independent contractor is considered to be an invitee of the employer." *Scharver v. Am. Plastic Prods. LLC*, 5th Dist. No. 2009 CA 00087, 2010-Ohio-230, ¶ 13, citing *Schwarz v. Gen. Electric Realty Corp.*, 163 Ohio St. 354, 357-58 (1955). Under both "common law and R.C. 4101.11, a premises owner's duty to a business frequenter, including an employee of an independent contractor, requires ordinary care: (1) to maintain the premises in a reasonably safe condition; and (2) to inform the frequenter of unknown and not obvious hazards on the premises." *Hunter v. State Dept. of Mental Retardation & Dev. Disabilities*, 10th Dist. No. 95API09-1184 (Feb. 15, 1996). *See also Schwarz* at paragraph one of the syllabus ("Where an owner of premises engages an independent contractor to do work thereon, an employee of the contractor while performing the work is on the premises impliedly as an invitee of the owner, and the owner

owes the employee the duty of exercising ordinary care to maintain the premises in a reasonably safe condition for use.").

{¶ 33} Appellants first contend ODRC negligently created and allowed a hazardous and defective condition to exist on the premises whereby hazardous and toxic fumes, vapors, and gases were permitted to be released and disseminated throughout the area where appellants worked. More specifically, appellants assert that ODRC allowed such condition "in the form of an improperly designed[] and constructed exhaust ventilation system that was positioned adjacent to the air intake system whereby under certain atmospheric conditions exhaust toxic fumes and vapors and chemicals would be disseminated throughout the building through the air intake system." According to appellants, ODRC "failed to inspect, remove or warn them of the existence of this dangerous condition." (Appellants' Brief at 31.) Appellants rely on the provisions of R.C. 4101.11 and 4101.12 as imposing the duty of an employer to protect employees and frequenters and to furnish a safe place of employment.

{¶ 34} R.C. 4101.11 states as follows:

Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.

{¶ 35} R.C. 4101.12 provides:

No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

{¶ 36} In support of their contention that ODRC negligently created and allowed a hazardous and defective condition, appellants rely primarily on the testimony of their expert, Lee Martin, as well as an architect report prepared by Martin. Appellants cite to the following portions of that report:

> Within the bounds of reasonable architectural and technical certainty, and subject to change if additional information becomes available, it is my professional opinion that:
>
> 1. The defective installation of the HVAC system in the CFS [consolidated food service] building violated code requirements, applicable industry standards, as well as contract document requirements, and created a dangerous condition.
>
> 2. The defective installation of the HVAC system in the CFS building allowed noxious odors to be carried through the medical/dental portions of the building, creating a dangerous condition for the occupants.
>
> 3. The failure of ORW and ODRC to provide adequate separation between the roof-mounted outside air and supply air openings, and between the kitchen exhaust fan and the outside air opening, as required by codes, industry standards and the contract documents for construction of the CFS building, created the dangerous condition whereby outside air entering [AH-2] was contaminated and then distributed throughout the medical/dental portion of the building.

(Pls.' Ex. 15 at 8.)

{¶ 37} Appellants maintain that trial testimony suggests the most probable potential pathway of exposure involved fumes from the kitchen/dining area that were distributed throughout the medical building via the AH-2 handler, and that the same AH-2 handler could have disseminated fumes and odors from a spill from the mammogram machine through either direct exhaust into the air supply line or through re-entry from the roof exhaust. While appellants acknowledge the decision to circulate air from the kitchen/dining area into the medical/dental building did not violate code requirements, appellants cite testimony by Martin that it was not a good decision. Appellants further argue the positioning of the intake and exhaust systems on the roof violated code regulations and deviated from plan requirements.

{¶ 38} Finally, appellants argue that employers "should be held to a higher standard of conduct specified by statutory authority to provide a 'safe place to work' and to do everything necessary to comply with this statutory mandate of providing safe work places." (Appellants' Brief at 37.)  Appellants argue that Wisconsin's frequenter statute contains similar language to that of Ohio's frequenter statutes, and appellants point to the Wisconsin statute in support of their argument for imposing a higher standard of care than that imposed by common law negligence.

{¶ 39} In response, ODRC argues the Court of Claims did not find the testimony of appellants' expert, Martin, to be credible.  ODRC further argues that the Court of Claims properly relied on the testimony of their witnesses, Beougher and Crawford, to find the HVAC system was properly assembled and installed and that there was no deviation from the plan resulting in a defect.

{¶ 40} In concluding that appellants failed to establish a breach of ordinary care, the magistrate addressed their contention that a toxic substance originated either in the food services side of the building and was drawn directly into the pharmacy via a defective air-handling unit or, alternatively, that an improperly installed air intake unit drew the substance back into the building from the outside and distributed it around.  In addressing the testimony of appellants' expert (Martin), who "opined that the improper position of the air-handler units could have caused an unknown hazardous substance to be drawn in and disseminated throughout the building," the magistrate noted that Martin, who testified the external air handlers were too close (i.e., located less than ten feet apart), "conceded that he took no actual measurements of the distance between the air-handlers."  The magistrate further observed that Martin "acknowledged * * * the mechanical system in the medical services building was properly designed and constructed in accordance with applicable building codes." (Mag. Decision at 11.)

{¶ 41} In contrast, the magistrate found persuasive the testimony of Beougher "that the HVAC system in the Medical Services building at ORW was properly assembled and installed."  The magistrate held that appellants "failed to establish that a deviation from the plan resulted in any defect in the system which would constitute a breach of defendant's duty to maintain the premises in a reasonably safe condition."  (Mag. Decision at 11.)

{¶ 42} In addition, the magistrate found unpersuasive "any claim that the mechanical systems of the building were defectively installed." In reaching this determination, the magistrate relied on the testimony of Crawford "that preventative maintenance was routinely performed on the air-handler units, and no changes in setup or configuration of the units had been made since they were installed during construction of the building." The magistrate also cited testimony by Crawford that "any complaints or work-orders related to the performance of the air-handling units would have come to him in the form of a work-order, but upon review of the maintenance records from ORW, no such work-order related to the air-handling units was received." Finally, the magistrate found "[t]he evidence showed that the air-handling system in question was installed more than two decades ago, and there is no evidence of any injuries caused by substance exposures before the present case." (Mag. Decision at 11.)

{¶ 43} The Court of Claims addressed and rejected appellants' objections to the magistrate's decision with respect to the issues of a purported defect in the HVAC system plan and whether ODRC breached a duty to appellants, holding in part as follows:

> [Appellants] argue that the magistrate erred when finding that [appellants] failed to show that a deviation in the HVAC system plan resulted in any defect that "would constitute a breach of [ODRC's] duty to maintain the premises in a reasonably safe condition." The Court disagrees. Although [appellants'] expert architect opined that the HVAC system was improperly constructed because the air-handling units were allegedly less than ten feet apart, he also acknowledged that he took no actual measurements of the distance between them. Even assuming the air-handlers were improperly constructed, [appellants] have offered insufficient evidence to conclude that [ODRC] failed to maintain the premises in a reasonably safe condition.
>
> Indeed, [ODRC] was neither responsible for the design and construction of the HVAC system nor ensuring the HVAC system was properly installed when it took possession of the building. Additionally, the maintenance manager at ORW testified that preventative maintenance was routinely performed on the HVAC system and had been performed in January 2010 during which no issues were discovered. Therefore, the Court finds the magistrate appropriately applied the law. For the same reasons, the Court is not persuaded by [appellants'] argument that the magistrate erred in failing to find that [ODRC] breached its duty of care, pursuant to R.C.

4101.11, to "furnish employment which is safe for the employees" and "to do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees and frequenters."

(Decision at 8-9.)

{¶ 44} Upon review, we conclude the findings of the Court of Claims are supported by competent and credible evidence. At trial, appellants' expert, Martin, testified that he determined "there were three avenues of potential contamination." He stated "[t]he first would have been something being taken into air handler 2 through the return air ductwork," and then distributed "through the medical/dental facility on the supply side through air handler 2." Martin testified that "[t]he second most likely cause would have been contamination above the roof between air handlers 1 and 2," and "the third most likely would have been some kind of exhaust lingering above the roof of the building and being ingested into air handler 2." (Tr. Vol. II at 187.)

{¶ 45} When asked on direct examination if he made measurements when he inspected the roof, Martin initially responded: "Yes. * * * I didn't measure all that much, but it seemed to me that air handler 1 and 2 were too close together with respect to the relief and the outside air intake ductwork that came through the louvered penthouses." (Tr. Vol. II at 187-88.) According to Martin, building plan notes "indicated * * * the intake and the relief should be at least 10 feet apart," and he stated they were not ten feet apart. (Tr. Vol. II at 188.) Martin testified that the Ohio Mechanical Code "requires those relief and outside air intakes to be separated two feet vertically and ten feet horizontally at a minimum." (Tr. Vol. II at 188.)

{¶ 46} However, on cross-examination, when asked if he took any "actual measurements," Martin responded: "I don't recall." (Tr. Vol. II at 205.) Further, when asked whether his opinion that the distance between "the intake and the relief" violated code provisions was based on his "guesstimate, because you didn't measure anything," Martin responded: "I don't recall how I measured on the day I was there." Rather, Martin stated, he "estimated six to eight" feet between the two air handlers. (Tr. Vol. II at 245.)

{¶ 47} With respect to the internal distribution of air from the kitchen into the medical building, Martin opined: "Well, I think my primary complaint would be that that's just not good mechanical design." (Tr. Vol. II at 199.) When asked on cross-examination

whether the design of the HVAC system was improper, Martin responded: "No. I believe I characterized the design of the mechanical system where air was shared on both sides of the demising partition between the kitchen and the medical/dental facility as poor design." He acknowledged "it does not" violate any code provision. (Tr. Vol. II at 241.) He was not aware of any evidence indicating ODRC had knowledge of a deviation in construction from the design plans. Martin agreed that no tests indicated levels of exposure to any toxin or chemical after the event, and he also agreed the fire marshal was unable "to establish a cause" for the injuries. (Tr. Vol. II at 269.)

{¶ 48} Beougher, the program manager for the Ohio Facilities Construction Commission and former state architect, testified that the constructing authority for the building project was the State Architect's Office, who would have responsibility to ensure the HVAC system was built according to plans. Beougher testified it was reasonable for ODRC to believe the HVAC system was built according to code requirements at the time it took possession because "the Department of Commerce had certified that the building was ready for occupancy." (Tr. Vol. III at 448.)

{¶ 49} On cross-examination, when asked about Martin's testimony that placing an exhaust to the air handler from the kitchen/dining area to service the medical building was poor planning, Beougher responded: "So it may not be a best practice, but I don't see anything wrong with doing it that way. There's a supply that also serves that area from the same air handling unit." (Tr. Vol. III at 463.)

{¶ 50} When asked whether he had any concerns about the safety of the HVAC system in the building, he responded: "No, I do not." (Tr. Vol. III at 469.) Beougher further explained:

> So much has been made about the relief vent and the outdoor air intake. Only a portion of the air going through that air handler is going to be pushed out to the outside and then sucked in from the outside through the outside air intake. The majority of that air is going to be returned directly through the air handler through the filter, through the coil that would heat and cool it, and back into the building.
>
> So going outside through the relief vent, it has a chance to diffuse with the outside air and have much less concentration of any items that might be in that air once it gets sucked back into the outdoor air intake. Going through the unit itself,

> there's no chance for diffusion.  It's going straight through at
> full concentration.

(Tr. Vol. III at 469-70.)

{¶ 51} Crawford, the building construction superintendent at ORW, testified that he maintains the maintenance records for the facility.  At trial, Crawford identified exhibit A as a work order log indicating that "preventative maintenance work on air handler 2" was completed on "1-25-2010."  (Tr. Vol. III at 486.)  Crawford testified that any mechanical issues would have been addressed at that time; he further stated there had not been any changes to the actual positioning of the exhaust and intake on the HVAC system in the medical building.

{¶ 52} As noted above, one of the theories advanced by appellants' expert was that ODRC failed to provide adequate separation between the roof-mounted air handlers, i.e., that they were not at least ten feet apart.  As also noted, in addressing Martin's opinion that the "improper position of the air-handler units could have caused an unknown hazardous substance to be drawn in and disseminated throughout the building," the magistrate cited the fact Martin "conceded that he took no actual measurements of the distance between the air-handlers."  (Mag. Decision at 11.)  The record supports the findings of the magistrate and Court of Claims that he did not take actual measurements but, rather, according to Martin's own testimony, only "estimated" the distance to be less than ten feet.  (Tr. Vol. II at 245.)  Further, it was the role of the trier of fact to assess the credibility and weight of Martin's testimony.  In this respect, "[t]he trier of fact is not required to credit any expert," and the trier of fact "may accept all, some, or none of the expert testimony."  *Butler v. Stevens*, 2d Dist. No. 22822, 2009-Ohio-2775, ¶ 39, citing *Hotel Statler v. Cuyahoga Cty. Bd. of Revision*, 79 Ohio St.3d 299, 304 (1997).

{¶ 53} In a similar vein, it was within the province of the trier of fact whether to credit the competing testimony of the ODRC witnesses, including the testimony of Beougher that the HVAC system was properly designed and constructed.  The magistrate and Court of Claims found credible Beougher's testimony on this issue, and we will not disturb that credibility determination.  The trier of fact could have also found credible the testimony of Crawford, who stated that preventative maintenance was routinely performed (including during January 2010), and that no prior incidents involving exposure to

substances had occurred. Upon review, we find there was competent, credible evidence on which the Court of Claims could have based its determination that ODRC did not breach its duty of ordinary care toward appellants.

{¶ 54} Appellants' reliance upon a Wisconsin frequenter statute to argue employers should be held to a higher standard of conduct is unpersuasive. It has been observed that "R.C. 4101.11 and 4101.12 are commonly referred to as 'frequenter' statutes * * * enacted to benefit employees." *Gillotti v. Rimedio*, 11th Dist. No. 2002-T-0106, 2003-Ohio-5708, ¶ 20. While the "passage of the Ohio Workers' Compensation Act * * * rendered these statutes largely obsolete," the frequenter statutes "[t]oday * * * are most commonly used by subcontractors who seek damages from property owners or contractors in privity with their employers, who fail to keep their property safe from hazards for 'frequenters.' " *Id.* Further, "[t]he Supreme Court of Ohio has clarified that an employer's duty under the 'frequenter' statutes 'is no more than a codification of the common-law duty owed by an owner or occupier of premises to invitees, requiring that the premises be kept in a reasonably safe condition, and that warning be given of dangers of which he has knowledge.' " *Id.*, quoting *Eicher v. United States Steel Corp.*, 32 Ohio St.3d 248, 249 (1987).

{¶ 55} Ohio courts have held that the duty imposed by R.C. 4101.11 (and 4101.12) "is one of ordinary care." *Newton v. Pennsylvania Iron & Coal, Inc.*, 85 Ohio App.3d 353, 357 (2d Dist.1993). *See also Brauning v. Cincinnati Gas & Elec. Co.*, 54 Ohio App.3d 38, 44 (1st Dist.1989) ("The duty imposed under R.C. 4101.11 and 4101.12 is similar to the common-law duty of an owner * * * to his invitees" under which the owner "owes a duty to his invitees to exercise ordinary care to maintain the premises in a reasonably safe condition."); *Hunter* ("Under common law and R.C. 4101.11, a premises owner's duty to a business frequenter, including an employee of an independent contractor, requires ordinary care.").

{¶ 56} Based upon the foregoing, appellants' first and fifth assignments of error are not well-taken and are overruled.

{¶ 57} Appellants' second and fourth assignments of error are interrelated and will be considered together. Under the second assignment of error, appellants assert the magistrate and Court of Claims erred in not applying the doctrine of *res ipsa loquitor* to the facts of the case. Under the fourth assignment of error, appellants contend the magistrate

and Court of Claims erred in finding the series of events at issue could be attributable to a reason other than the negligence of ODRC.

{¶ 58} Appellants, acknowledging they "have no direct evidence identifying the gas, fume, vapor, or chemical that they and others were exposed to," argue it was undisputed ORW was under the exclusive management and control of ODRC. (Appellants' Brief at 40.) Further noting they have "no direct evidence of the source of the exposure by way of either an accident, a spillage, or any other cause," appellants submit that "the scenario in this case is one in which 'the injury would not have occurred if ordinary care had been observed.' " (Appellants' Brief at 41.)

{¶ 59} The doctrine of *res ipsa loquitor* "is 'a rule of evidence which permits the trier of fact to infer negligence on the part of the defendant from the circumstances surrounding the injury to plaintiff.' " *Heiert v. Crossroads Community Church, Inc.,* 1st Dist. No. C-200244, 2021-Ohio-1649, ¶ 45, quoting *Hake v. George Wiedemann Brewing Co.*, 23 Ohio St.2d 65, 66 (1970). In order for "the doctrine to apply, a plaintiff must show '(1) [t]hat the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed.' " *Id.*, quoting *Hake* at 66-67.

{¶ 60} However, "[t]he Ohio Supreme Court has stressed that this rule of evidence should only be used when a defendant's negligence is the only reasonable inference from the facts." *Klasic v. Time Warner Entertainment Co.*, 7th Dist. No. 06 MA 49, 2007-Ohio-1125, ¶ 19. In this respect " '[w]here it has been shown by the evidence adduced that there are two equally efficient and probable causes of the injury, one of which is not attributable to the negligence of the defendant, the rule of res ipsa loquitor does not apply.' " *Id.,* quoting *Jennings Buick, Inc. v. Cincinnati*, 63 Ohio St.2d 167, 171 (1980).

{¶ 61} The issue as to whether a plaintiff "has adduced sufficient evidence to warrant application of the doctrine of res ipsa loquitor is a question of law subject to de novo review on appeal." (Emphasis sic.) *Ray v. Wal-Mart Stores, Inc.,* 4th Dist. No. 12CA21, 2013-Ohio-2684, ¶ 59.

{¶ 62} In support of their argument for application of the doctrine of *res ipsa loquitor*, appellants argue, as they did under the prior assignments of error, that the positioning of the intake and exhaust systems on the roof violated code regulations. Appellants further maintain that, although the decision to circulate air from the kitchen/dining area into the medical/dental building did not violate code requirements, there was testimony (by appellants' expert Martin) that it was not a good decision, and that it constituted a poor design.

{¶ 63} The magistrate addressed the issue of *res ipsa loquitor*, noting that, "[a]lthough plaintiffs allege their symptoms resulted from the existence of a noxious gas or vapor, they acknowledge that they failed to definitively identify either the substance that caused their injuries, or even the source of that substance." (Mag. Decision at 13-14.) Specifically, the magistrate cited admissions in appellants' "post-trial brief that they 'have no direct evidence identifying the gas, fume, vapor, or chemical that they were exposed to.' " (Mag. Decision at 14.)

{¶ 64} The magistrate determined that appellants "failed to establish that their injuries occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed." The magistrate further determined that "[e]ven assuming that a harmful substance was present in the pharmacy, [appellants] offered insufficient evidence to show that the presence of such a substance was a proximate cause of their alleged injuries," and that "the series of events that occurred beginning on the morning of February 4th could be attributable to a reason other than [ODRC's] negligence." (Mag. Decision at 14.)

{¶ 65} In addressing appellants' objections to the above findings and conclusions of the magistrate, the Court of Claims noted "[t]he magistrate found that the doctrine of *res ipsa loquitor* did not apply to the facts of this case because the events that occurred on February 4, 2010 could be attributed to a reason other than [ODRC's] negligence and [appellants] could not establish that their injuries would not have occurred if [ODRC] had exercised ordinary care." (Decision at 8.) The Court of Claims agreed with those determinations, holding in part:

> [Appellants] argue that requiring them to identify the specific
> toxin that caused their injuries is an impossible burden. The
> Court is not persuaded by this argument because the

> magistrate imposed no such burden when reaching his conclusion. Despite [appellants] admitting they could not identify a specific toxin and the various testing performed showed no toxin was detected, the magistrate still hypothetically assumed [appellants'] injuries were caused by a harmful substance when finding that they failed to present evidence sufficient to establish [ODRC's] negligence was the proximate cause of their injuries. Additionally, although [appellants] claim the improperly constructed HVAC system was the cause for disseminating the inferred harmful toxin, they offer insufficient proof to conclude that such a substance ever circulated through the HVAC system. Indeed, [t]he doctrine of *res ipsa loquitor* does not supply proof that the instrumentality caused the [appellants'] injuries; rather, such proof of causation is a prerequisite to application of the doctrine.

(Citation omitted.) (Decision at 8.)

{¶ 66} This court has noted that " '[t]he doctrine of res ipsa loquitur is not a substantive rule of law furnishing an independent ground for recovery; rather, it is an evidentiary rule which permits, but does not require, the jury to draw an inference of negligence when the logical premises for the inference are demonstrated.' " *Kleisch v. Cleveland State Univ.*, 10th Dist. No. 05AP-289, 2006-Ohio-1300, ¶ 6, quoting *Jennings Buick* at 169. Further, "[b]ecause the doctrine of res ipsa loquitur is an evidentiary rule and not a substantive rule of law furnishing an independent ground for recovery, * * * it cannot constitute a legally cognizable basis for a claim." *Id.*, citing *Jennings Buick* at 169. Thus, "[t]he doctrine of *res ipsa loquitur* does not alter the nature of the plaintiff's claim in a negligence action; it is merely a method of proving the defendant's negligence through the use of circumstantial evidence." *Jennings Buick* at 170. Nor does the doctrine of *res ipsa loquitor* "supply proof that the instrumentality caused the plaintiff's injuries; rather, such proof of causation is a prerequisite to application of the doctrine in the first instance." *Hickey v. Otis Elevator Co.*, 163 Ohio App.3d 765, 2005-Ohio-4279, ¶ 27.

{¶ 67} In the present case, it is undisputed there was no direct evidence identifying either the offending substance that caused appellants' injuries or the source of such substance. While appellants argue ORW was under the exclusive control of ODRC, we agree with ODRC that the issue is not whether the prison itself was under the exclusive control of ODRC; rather, the issue is whether there was an instrumentality under the

exclusive control of ODRC that caused injury to appellants. Here, while the trier of fact arguably could have found the offending substance was unknown but under ODRC's exclusive control, it was not required to do so, and could have found, based on the record presented, insufficient evidence to establish that the offending instrumentality which caused the injury was within the exclusive control of ODRC.

{¶ 68} Further, and more significantly, both the magistrate and the Court of Claims found insufficient evidence to establish that ODRC's negligence was the proximate cause of appellants' injuries. On this issue, the Court of Claims recognized that the doctrine of *res ipsa loquitor* cannot supplant the need for adequate proof of causation, noting that the magistrate, even "hypothetically" assuming appellants' injuries "were caused by a harmful substance," ultimately determined appellants "failed to present evidence sufficient to establish [ODRC's] negligence was the proximate cause of their injuries." (Decision at 8.) Here, the magistrate, as trier of fact, weighed and considered the competing causation testimony, and was free to draw the inference that the cause could not be determined based on the circumstantial evidence presented (i.e., that there could have been a non-negligent cause). In light of such determination, the trier of fact was not required to apply the doctrine of *res ipsa loquitor* to infer causation. Additionally, while appellants theorized that "an improperly constructed HVAC system was the cause for disseminating the inferred harmful toxin," the Court of Claims concluded appellants offered "insufficient proof to conclude that such a substance ever circulated through the HVAC system." (Decision at 8.) Thus, the Court of Claims agreed with the magistrate's determination that appellants failed to establish their injuries would not have occurred if ODRC had exercised ordinary care. Based on this court's review of the record, we find no error with that determination.

{¶ 69} Accordingly, appellants' second and fourth assignments of error are not well-taken and are overruled.

{¶ 70} Under the third assignment of error, appellants assert the magistrate and Court of Claims erred in finding credible the opinion of Dr. Heath Jolliff indicating that the constellation of symptoms suffered by appellants were not of the type typically caused by any toxic exposure. Appellants maintain Dr. Jolliff had no history as to whether these individuals experienced any fumes, odors or gases, or what their individual symptoms and

complaints were, and appellants further contend his opinion testimony was not supported by the evidence.

{¶ 71} The findings of the magistrate provide the following summary of Dr. Jolliff's testimony presented at trial:

> [ODRC's] expert, Dr. Heath Jolliff, an emergency room physician and toxicologist, testified that he reviewed both [appellants'] medical records and the Material Safety Data Sheets for the chemicals that were located in the room adjacent to the pharmacy which were used for processing x-rays and mammograms. He also reviewed additional tests which were performed to detect toxins in the pharmacy buildings. Dr. Jolliff opined that the data he reviewed showed that [appellants'] symptoms were not caused by exposure to any toxic substance circulating throughout the building. Dr. Jolliff testified credibly that none of the chemicals located in the pharmacy would have caused the symptoms suffered by [appellants]. Dr. Jolliff opined that the constellation of symptoms described by [appellants] were not of the type that are typically caused by any toxic exposure, but rather are indicative of the body's natural response to stressful situations. Indeed, [appellants] acknowledge that their medical tests failed to identify "the offending substance." * * * The court finds that the testimony of Dr. Jolliff was credible and persuasive and that [appellants] have failed to establish that [ODRC's] acts or omissions caused their injuries.

(Mag. Decision at 12-13.)

{¶ 72} In their objections to the magistrate's decision, appellants argued that Dr. Jolliff's opinion "was not supported by the trial testimony and evidence because he was not furnished any medical information or 'incident reports from the eleven treated in the emergency room other than those of the [appellants'] and 'had no history as to whether these individuals experienced any fumes, or odors, or gasses or what their individual symptoms and complaints were.' " (Decision at 6.) The Court of Claims found appellants' objections unpersuasive, holding in relevant part:

> Prior to rendering an opinion, Dr. Jolliff had reviewed, among other things, [appellants'] medical records as well as the Material Safety Data Sheets which listed the chemicals that were near the pharmacy. Additionally, Dr. Jolliff rendered his opinion while assuming that several individuals were transferred to the hospital with "loss of consciousness,

dizziness, headache, metallic taste in mouth, blurred vision, elevated heart rate, and elevated blood pressure." [Appellants] take issue with the fact that chest pain and burning in the eyes, nose, and throat were not included among the symptoms described, arguing this renders Dr. Jolliff's opinion unreliable. However, in addition to his knowledge and experience as a toxicologist, Dr. Jolliff referenced a 2000 New England Journal of Medicine article studying "mass psychogenic illness" affecting 186 patients after experiencing a "gasoline-like smell" in a teacher's classroom. Despite no toxin ever being found, some of the reported symptoms included "headaches, dizzy, nausea, chest tightness, difficulty breathing, sore throat, burning eyes, cough[,]" shortness of breath, and metallic taste. Furthermore, [appellants] had the opportunity to cross-examine Dr. Jolliff at trial as to his lack of knowledge about the other eleven injured, and they did not. Therefore, the Court finds no error with the magistrate finding that Dr. Jolliff's expert opinion was credible.

(Decision at 6-7.)

{¶ 73} Upon review, we find no error by the Court of Claims in relying on the opinion testimony of ODRC's expert witness. At trial, Dr. Jolliff testified that he reviewed appellants' medical records as well as various other documents including "incident reports" from ORW, the "Marysville Fire Department air sampling report," and "material safety data sheets for the ORW pharmacy area." (Tr. Vol. IV at 603-04.) He also reviewed the deposition testimony of appellants' expert, Dr. Robert Hess.

{¶ 74} Dr. Jolliff opined that, based on his review of appellants' records, the symptoms reported by appellants were not, within a reasonable degree of medical and scientific certainty, related to exposure to a toxin. He elaborated that "a source was never found" and, based on a review of the material safety data sheets, "none of those chemicals that are listed there would cause these type[s] of signs and symptoms with this type of exposure." (Tr. Vol. IV at 622-23.) Dr. Jolliff further testified that "we don't see anything on blood work, urine testing, heavy metal screening or anything like that that tells us that there was a toxic exposure in the body at that time." (Tr. Vol. IV at 623.)

{¶ 75} As indicated, appellants argued in their objections before the Court of Claims that Dr. Jolliff had not reviewed medical information of various other (non-plaintiff) individuals who had been treated following the incident, and that he lacked a history of

whether these individuals had experienced fumes, odors or gases. The basis of this argument arose during the direct examination of Dr. Jolliff when he testified that, although he had reviewed appellants' medical records, he did "not ha[ve] access" to the medical records of the other individuals treated that day. (Tr. Vol. IV at 627.) The magistrate, however, in addressing the testimony of Dr. Jolliff, noted that appellants themselves "acknowledge[d] that their medical tests failed to identify 'the offending substance.' " (Mag. Decision at 13.) Further, as noted by the Court of Claims, the record indicates Dr. Jolliff rendered his opinion after being asked to "assume that in addition to [appellant] Hawley and [appellant] Schultz, there were nine other staff members and two inmates transported to the hospital * * * on February 4th, 2010 experiencing symptoms including things such as loss of consciousness, dizziness, headache, metallic taste in mouth, blurred [vision], elevated heart rate, and elevated blood pressure." (Tr. Vol. IV at 623-24.)

{¶ 76} In the instant case, it was "within the [trier of fact's] province to determine how much weight to give" the expert's opinion. *Pep Boys-Manny, Moe & Jack of Delaware, Inc. v. Vaughn*, 10th Dist. No. 04AP-1221, 2006-Ohio-698, ¶ 23, citing *Pangle v. Joyce*, 76 Ohio St.3d 389, 395 (1996); *Kokitka v. Ford Motor Co.*, 73 Ohio St.3d 89, 92 (1995). As otherwise stated, "[o]nce expert testimony [i]s admitted," it is the role of the trier of fact "to assign weight to the experts' testimony and opinions." *Pangle* at 395. Further, while Civ.R. 53(D)(4)(d) "requires a trial court to 'undertake an independent review as to the objected matters,' " the "independent review requirement" of the statute "does not prohibit the trial court from deferring to the magistrate's resolution of credibility because the magistrate retains a superior position, as the trier of fact, to consider the demeanor of witnesses and evaluate their credibility." *Tabatabai v. Tabatabai*, 9th Dist. No. 08CA0049-M, 2009-Ohio-3139, ¶ 14.

{¶ 77} The Court of Claims, based on its independent review of the record, agreed with the magistrate's "finding that Dr. Jolliff's expert opinion was credible." (Decision at 7.) We find no error with that determination, nor do we find merit with appellants' contention the opinion testimony was not supported by competent, credible evidence. Accordingly, we find no error by the Court of Claims in rejecting appellants' objection to the magistrate's decision on this issue.

{¶ 78} Appellants' third assignment of error is not well-taken and is overruled.

{¶ 79} Based upon the foregoing, appellants' five assignments of error are overruled, and the judgment of the Court of Claims of Ohio is hereby affirmed.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

_____